Mark Anthony SHERFEY, Sr. and
Laurie Sherfey, Appellants,

v.

Marcus D. SHERFEY and Naomi
Sherfey, Appellees.

No. 2001–CA–000519–MR.

Court of Appeals of Kentucky.

Jan. 18, 2002.

Discretionary Review Denied
by Supreme Court June 5, 2002.

William Yesowitch, Louisville, KY, for appellants.

Danny J. Basil, Glasgow, KY, for appellees.

Before DYCHE, JOHNSON and KNOPF, Judges.

## OPINION

JOHNSON, Judge.

Mark Anthony Sherfey, Sr., and Laurie Sherfey have appealed from an order entered by the Monroe Circuit Court, on February 23, 2001, which awarded custody of their son, T.S., to his paternal grandparents, Marcus D. Sherfey and Naomi Sherfey. Having concluded that the trial court's finding that the grandparents met the statutory definition of "de facto custodians," pursuant to KRS[1] 403.270(1) is not clearly erroneous, and that the trial court did not abuse its discretion in awarding custody to the grandparents, we affirm.

For some time prior to June 1998, T.S., who was born on October 23, 1985, had experienced a troubled relationship with his parents. T.S. left his parents' home on June 18, 1998, and walked to his grandparents' residence a short distance away. One month later, in July 1998, T.S.'s parents moved from Kentucky to Tennessee, voluntarily leaving T.S. behind.

For the better part of the next two years, T.S. lived with his paternal grandparents. During that time period T.S. became involved in school, church and community activities. According to his teachers and coaches, T.S. is a well-adjusted and content teenager.

From July 1998 through June 1999, T.S. had very little contact with his parents. His grandparents provided nearly all of his financial and emotional support. The only period of disruption in T.S.'s new life with his grandparents was a one-month stay at Camp Tracy, located in Jacksonville, Florida. The one-month stay at this Christian facility had been secretly planned by T.S.'s parents. T.S. did not want to attend the camp and had to be forcibly removed from his grandparents' house by Therapeutic Transports, a firm specializing in the transportation of "difficult" children.

Outraged by the clandestine efforts of Therapeutic Transports, the grandparents filed an action in the Monroe District Court, seeking the issuance of a domestic violence order against their son, Mark Sherfey. After filing the action, the grandparents had T.S. returned to their custody on July 17, 1999, exactly one month after he had been taken from their home by Therapeutic Transports. On September 21, 1999, the Monroe District Court entered a domestic violence order against Mark Sherfey, but set the matter for review at the conclusion of the 1999–2000 school year. In the meantime, T.S.'s life with his grandparents apparently continued as it had before.

In July 2000, Mark Sherfey collaterally attacked the September 1999 domestic violence order. In his motion to set aside the order, he alleged that the trial court had lacked personal jurisdiction over him. The grandparents responded on July 25, 2000, by filing a petition for custody of T.S. in Monroe Circuit Court. The parties then agreed to dismiss the domestic violence action in the district court and to proceed

---

1. Kentucky Revised Statutes.

before the circuit court solely on the issue of custody. On February 23, 2001, following an evidentiary hearing, the Monroe Circuit Court entered a judgment granting custody of T.S. to his grandparents. This appeal followed.

Over the past century, changing demographics have greatly altered traditional notions of the average American family. Increases in single parentage and non-traditional family structures have expanded the family roles and responsibilities of grandparents and other third parties. In recognition of this modern trend, many state legislatures have passed various non-parental visitation and custody statutes. Seemingly, the aim of these statutes is to protect the welfare of children who have developed parental-type relationships with such third parties. These statutes, however, do not come without a cost. Vesting greater rights in third parties clearly places a substantial burden on the traditional parent-child relationship, raising questions of constitutional import.[2]

In Kentucky, our legislature has promulgated KRS 403.270(1), which gives "de facto custodians" the same standing in custody matters as each of the child's parents. KRS 403.270(1) defines a "de facto custodian" as "a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of . . . one (1) year or more if the child is three (3) years of age or older. . . ." However, the statute goes on to caution that: "Any period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child shall not be included

in determining whether the child has resided with the person for the required minimum period."

Mark and Laurie have raised three issues in their appeal: (1) whether the grandparents had met the "de facto custodian" time requirement; (2) whether KRS 403.270(1) unconstitutionally infringes on their fundamental rights as parents to have custody and control of their children; and (3) whether the trial court's findings were clearly erroneous or whether its custody decision was an abuse of discretion.

We must first determine whether the grandparents properly qualified as "de facto custodians" under the one-year custodial period required by KRS 403.270(1)(a). Mark and Laurie argue: (1) that T.S.'s visit to Camp Tracy sufficiently interrupted the period of time during which the grandparents provided support, causing them to fall short of the one-year period necessary for "de facto custodian" status, and (2) that, in the alternative, court appearances by Mark and Laurie to defend a juvenile petition and a domestic violence action constitute a tolling of the one-year time period.

■ We hold that T.S.'s one-month stay at Camp Tracy did not disqualify the grandparents from achieving "de facto custodian" status. From the record, it is clear that T.S. spent roughly two years under the care and custody of his grandparents prior to the filing of the current action. The nonconsensual transporting of T.S. to Florida was adjudged by the courts of Kentucky to be an act of domestic violence—not an abandonment of support by the grandparents.[3] Further, T.S. never fully left the custody and control of his

---

**2.** *See Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

**3.** *Cf.* KRS 403.270(4): "The abandonment of the family residence by a custodial party shall not be considered where said party was physi-

cally harmed or was seriously threatened with physical harm by his or her spouse, when such harm or threat of harm was causally related to the abandonment."

grandparents. He merely spent an unhappy month at a camp where he continued to maintain contact with his grandparents. Obviously, every parent who sends his or her child to a summer camp has not surrendered custody of the child.

 We now turn to Mark and Laurie's alternative argument, that their defenses to a juvenile petition and a subsequent domestic violence petition, both regarding T.S., constitute a suspension of the time period in which the grandparents cared for T.S. In deciding this issue, we are confronted with interpreting the meaning of KRS 403.270(1).

In construing our statutes we must "ascertain and give effect to the intent of the General Assembly. We are not at liberty to add or subtract from the legislative enactment nor discover meaning not reasonably ascertainable from the language used."[4] ... Clearly, it is not our function to "add words and meaning to a statute that is clear on its face."[5] "The intention 'must be determined from the language of the statute itself if possible.'"[6]

 The pertinent provision of KRS 403.270(1)(a) specifies that "[a]ny period of time after a legal proceeding has been *commenced* by a parent *seeking to regain custody* of the child shall not be included in determining whether the child has resided with the person for the required minimum period" [emphasis added]. We believe that this language is clearly stated and specific in its terms. In order to suspend a period of residency with a "de facto custodian," the statute sets forth two requirements. First, the statute requires that the action be "commenced" by the parent—not merely defended. Second, the statute requires the court appearance to be an action in which the parents seek to "regain custody." From the plain language of the statute, it is clear that Mark and Laurie satisfied neither of these requirements. Not once during the two years T.S. spent with his grandparents did Mark and Laurie *initiate* a legal action to *regain custody* of T.S. In fact, it appears they voluntarily abandoned T.S., showing little concern for his daily well-being for nearly two years. Accordingly, we affirm the trial court's finding of *de facto* custodianship by the grandparents.

 We now turn to Mark and Laurie's argument that KRS 403.270(1) is unconstitutional.[7] The due process clause of the Fourteenth Amendment to the United States Constitution has long been recognized to contain a substantive component that "'provides heightened protection against government interference with certain fundamental rights and liberty interests.'"[8] The liberty interest at issue in this case, one of the oldest and most clearly established, is the interest of parents in the care, custody, and control of their chil-

---

**4.** *Posey v. Powell,* Ky.App., 965 S.W.2d 836, 838 (1998) (quoting *Beckham v. Board of Education of Jefferson County,* Ky., 873 S.W.2d 575, 577 (1994)).

**5.** *Id.* (quoting *Cole v. Thomas,* Ky.App., 735 S.W.2d 333, 335 (1987)).

**6.** *Gurnee v. Lexington–Fayette Urban County Government,* Ky.App., 6 S.W.3d 852, 856 (1999) (quoting *Moore v. Alsmiller,* 289 Ky. 682, 160 S.W.2d 10, 12 (1942)).

**7.** It is not clear from their brief whether Mark and Laurie contest the facial constitutionality of the statute or whether they merely challenge the statute's constitutional validity as applied to them. In any event, we can only address the "as-applied" constitutional challenge because the Attorney General was not given notice of the facial challenge pursuant to KRS 418.075 and Kentucky Rules of Civil Procedure (CR) 24.03. *See Maney v. Mary Chiles Hospital,* Ky., 785 S.W.2d 480 (1990).

**8.** *Troxel, supra,* 530 U.S. at 65, 147 L.Ed.2d at 56 (quoting *Washington v. Glucksberg,* 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)).

dren.[9] Over the years, the United States Supreme Court has jealously guarded this right, and has not encroached on it absent some compelling reason.[10]

Prior to the passage of KRS 403.270, parents could not lose custody of their children to a third party absent a showing of unfitness by clear and convincing evidence.[11] Our courts have stated that indicators of unfitness include such factors as "(1) evidence of inflicting or allowing to be inflicted physical injury, emotional harm or sexual abuse; (2) moral delinquency; (3) abandonment; (4) emotional or mental illness; and (5) failure, for reasons other than poverty alone, to provide essential care for the children."[12] Thus, unless some or all of the above factors were demonstrated the custodial rights of a natural parent always prevailed over the rights of a non-parent.

As applied to Mark and Laurie, we do not believe that the passage of KRS 403.270(1) significantly alters the preexisting law of custody determination in Kentucky. Although a showing of "unfitness" is not specifically required by KRS 403.270(1), the prerequisites necessary to prove "de facto custodianship" directly implicate at least two of the former unfitness factors. To be a *de facto* custodian under KRS 403.270(1)(a) a person must be the primary caregiver for and financial supporter of the child. Although a case in which the natural parents have been forced to abandon their children would be more constitutionally troubling, here Mark and Laurie voluntarily abandoned T.S. and failed, for reasons other than poverty alone, to provide essential care for T.S. A finding of unfitness would have been warranted in this case; therefore, it cannot be held that Mark and Laurie's constitutional rights were violated.

 As their final claim of error, Mark and Laurie argue that the trial court's findings were clearly erroneous and that its determination of custody was an abuse of discretion. "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."[13] A factual finding is not clearly erroneous if it is supported by substantial evidence.[14] "Substantial evidence" is evidence of substance and relevant consequence sufficient to induce conviction in the minds of reasonable people.[15] After a trial court makes the required findings of fact, it must then apply the law to those facts. The resulting custody award as determined by the trial court will not be disturbed unless it constitutes an abuse of

9. *Id.*

10. *See Reno v. Flores*, 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)(holding that so long as the parent adequately cares for his or her child, there will normally be no reason for the state to inject itself into the private realm of the family).

11. *See e.g., Davis v. Collinsworth*, Ky., 771 S.W.2d 329, 330 (1989)(citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); and *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).

12. *Id.*

13. CR 52.01; *Carnes v. Carnes*, Ky., 704 S.W.2d 207, 208 (1986).

14. *Owens–Corning Fiberglas Corp. v. Golightly*, Ky., 976 S.W.2d 409, 414 (1998); *Uninsured Employers' Fund v. Garland*, Ky., 805 S.W.2d 116, 117 (1991); *Faulkner Drilling Co., Inc. v. Gross*, Ky.App., 943 S.W.2d 634, 638 (1997).

15. *Golightly*, 976 S.W.2d at 414; *Janakakis-Kostun v. Janakakis*, Ky.App., 6 S.W.3d 843, 852 (1999)(citing *Kentucky State Racing Commission v. Fuller*, Ky., 481 S.W.2d 298, 308 (1972)).

discretion.[16] " 'Abuse of discretion in relation to the exercise of judicial power implies arbitrary action or capricious disposition under the circumstances, at least an unreasonable and unfair decision.' " ... "The exercise of discretion must be legally sound." [17]

 We hold that the trial court's factual findings were clearly supported by substantial evidence and that its custody ruling based on those factual findings was not an abuse of discretion. Before T.S. left his parents' home, he was a troubled teenager who fought often with his parents and siblings. After leaving home and moving in with his grandparents, T.S. became involved in school, church and community activities. According to T.S.'s teachers and coaches he is well-adjusted and apparently happy. During the two-year period away from his parents, T.S. had little contact with them. Mark and Laurie did not support T.S. financially and they did not express any overwhelming desire to visit with him. In short, T.S. has severed ties with his parents and chooses to live with his grandparents. In fact, T.S. has strongly stated his desire to continue living with his grandparents. Although, from the same evidence, a different trial judge might have overridden T.S.'s wishes and returned him to his parents' custody, the Monroe Circuit Court's decision to place T.S. with his grandparents was supported by substantial evidence and was not an abuse of discretion.

For the foregoing reasons, the judgment of the Monroe Circuit Court is affirmed.

ALL CONCUR.

16. *Bickel v. Bickel*, Ky., 442 S.W.2d 575, 577 (1969); *Carnes, supra.*

17. *Kuprion v. Fitzgerald*, Ky., 888 S.W.2d 679, 684 (1994).