RENDERED: JANUARY 26, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1254-MR

JAMES MONROE
APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.
HONORABLE LAUREN ADAMS OGDEN, JUDGE
ACTION NO. 20-CI-502015

EMILY WRIGHT AND ROBERT
APPELLEES
LOUIS FLECK

OPINION
AFFIRMING IN PART, REVERSING IN PART,
AND REMANDING

** ** ** ** **

BEFORE: CALDWELL, JONES, AND TAYLOR, JUDGES.

CALDWELL, JUDGE: James Monroe (Monroe) appeals from a family court

judgment not awarding him equal timesharing of his child with Emily Wright

(Wright). He also appeals from provisions in the same judgment requiring him to

execute a quitclaim deed ceding his interest in a home to Wright and to pay over

$6,500 to Wright for home-related expenses.

We reverse those provisions of the judgment requiring Monroe to execute the quitclaim deed and to pay Wright $4,500 in furniture replacement costs since Monroe was not provided adequate prehearing notice of property issue claims or a request for furniture replacement reimbursement. We remand for entry of an amended judgment which does not contain the quitclaim provision nor the provision requiring Monroe to pay $4,500 for furniture replacement. But we affirm the family court in ordering Monroe to pay Wright for other expenses relating to Monroe's violation of court orders as a proper exercise of the family court's contempt power – especially since Monroe received notice of Wright's request for payment of these other non-furniture replacement expenses in Wright's contempt motion. We also affirm the family court's timesharing decision.

## FACTS

Monroe and Wright were never married to one another. They have a child together, born in 2018. Monroe is listed as the father on the child's birth certificate.

The parties and their child previously lived together in a house which Wright bought several years ago. Monroe is not a party to the note or mortgage on the house.

In August 2019, Wright executed a quitclaim deed conveying the property to herself and Monroe. The deed stated $1.00 was paid as consideration.

The property was conveyed "for and during their joint lives with the remainder in fee simple to the survivor of them[.]"

The parties' relationship had soured by August 2020. Wright filed a police report stating that Monroe had engaged in an act of violence – grabbing her under the neck and shoving her to the ground after an argument. Wright never filed a petition for a protective order, however.

Shortly after Wright filed the police report, Monroe filed a petition for an order of protection alleging that Wright engaged in domestic violence against him. Monroe obtained an emergency protective order (EPO) which required Wright to vacate the house. According to Wright, Monroe made false allegations to obtain the EPO and he dismissed the protective order petition on his own motion shortly after Wright was forced to leave the house.[1]

A few days later, Wright filed the instant case in Jefferson Family Court with a Petition for Custody and Support. She requested the family court award joint legal custody of the child to the parties, with Wright being designated the primary residential parent. She also requested the court set a reasonable

---

[1] The record for the protective order proceedings initiated by Monroe is not before us.

parenting time schedule for Monroe and order him to pay child support. And she requested any other relief to which she was entitled.[2]

At some point, the child returned to live with Wright in a different residence, but Monroe continued to live in the house where the parties previously lived together.

In April 2021, Wright filed a motion to compel mediation and Monroe's removal from the house. She also requested that Monroe pay child support and her attorney fees for bringing the motion.

That spring, the family court granted the motion to require Monroe to vacate the house. It also issued orders requiring, *inter alia*, that Monroe must "leave the real property damage-free and swept clean" and that Monroe "shall not remove any personal property that he did not personally purchase solely himself."

Wright asserted that Monroe did not comply with the family court's orders and filed a motion to hold him in contempt. A sheriff's deputy certified that the order to vacate was satisfied (meaning Monroe left the house) in early June. A contempt hearing was scheduled for late June 2021, but the scheduled hearing was

---

[2] Shortly after filing her petition, Wright also filed a verified motion for immediate return of the child. It is not clear from the written record if or how the family court resolved this motion. The written record contains agreed orders concerning parental timesharing and how to conduct exchanges. But the case otherwise appeared to lie dormant for a few months.

cancelled due to impending mediation. The case appeared to again lie dormant for several months[3] before a September 2022 trial date was set.

A few weeks before the September 2022 trial date, Wright again filed a motion to hold Monroe in contempt for failure to comply with family court orders. She alleged that extensive damage to the home occurred before she returned to it and that Monroe removed items which he had not bought himself. She also alleged Monroe failed to pay his share of medical expenses and childcare costs and had failed to make child support payments. She further claimed she had to expend about $2,000 for home repair and cleaning expenses, an electric bill to restore power, and the sheriff's fee for removing Monroe from the home.

Wright also filed a trial memorandum in which she requested, *inter alia*, that the trial court order Monroe to quitclaim his interest in the house to her.

Following an approximately three-hour-long trial, the family court issued findings of fact and conclusions of law along with an order which it deemed final and appealable with no just cause for delay.

The family court noted the parties agreed to share joint legal custody, although it expressed concerns about their ability to co-parent. The family court

---

[3] In March 2022, the family court entered an order stating the case had been inactive for several months. The court further stated the action would be dismissed unless the parties explained any affirmative steps to conclude the case and/or otherwise explained why the case should not be dismissed. Shortly thereafter, Wright filed a motion to set a trial date, stating that mediation had occurred but was not successful and requesting a trial date.

also determined that equal timesharing was not in the child's best interest and elected to continue a timesharing plan previously agreed to by the parties with additional instructions about holidays. It also resolved issues about child support and tax exemptions.

Lastly, the family court discussed "property issues" before finding Monroe to be in contempt. The family court noted language about family courts' having "general jurisdiction" as divisions of circuit courts in the Kentucky constitution. And it discussed case law which it construed as broadly defining a family court's general jurisdiction. Thus, the family court determined it had "jurisdiction to address issues related to Ms. Wright's home and personal property."

The family court found that Wright paid the mortgage, property taxes and homeowner's fees – even while Monroe was in exclusive possession of the house for almost a year. The court also found that Wright "added Mr. Monroe to the deed, under duress, in 2019, shortly before the parties separated." And it found a lack of evidence that Monroe "purchased any interest in the home, or that Ms. Wright intended to gift him any interest in the property." The family court awarded the house to Wright and ordered Monroe to sign a quitclaim deed ceding his interest in the house to Wright.

In the next portion of its judgment (titled Contempt), the family court ordered Monroe to pay about $6,500 for expenses relating to the home to purge himself of contempt.[4]  These expenses included reimbursing Wright for home repairs, a bill to restore electric service previously cut off for nonpayment, and the sheriff's fee for removing Wright from the home – as Wright had requested in her contempt motion.  The family court also ordered Monroe to pay Wright $4,500 for furniture replacement to purge himself from contempt.

The family court noted that its orders from the spring of 2021 required Monroe to immediately vacate the home and to leave it clean and damage-free.  It rejected his assertions that he lacked notice of the orders and it found that he violated its orders willfully and without good cause.  It also found:  "Mr. Monroe left Ms. Wright's home in a state of disrepair, and he removed, or caused to be removed, nearly all of her furnishings and personal property."

Monroe filed a CR[5] 60.02 motion to vacate the family court judgment.  He argued that the family court lacked subject-matter jurisdiction to award Wright the home and force him to quitclaim his interest.  He also claimed the family court

---

[4] The family court also found Monroe in contempt for failure to pay child support as ordered and for failure to utilize a designated app for communication with Wright.  And it stated he could purge himself of contempt by paying child support as it became due and also awarded Wright a common-law judgment of $1,200 for attorney fees.  Monroe does not explicitly argue in his briefs that these contempt findings and sanctions relating to failure to pay child support and failure to use the app are erroneous.

[5] Kentucky Rules of Civil Procedure.

-7-

lacked jurisdiction to order him to pay restitution for property damage. Monroe requested that the family court vacate provisions of its order related to property disputes. He argued that resolution of property issues was not only outside the family court's subject matter jurisdiction, but also that such property issues were not properly before the court since the parties "were before the Court on a Motion issues for Contempt, Custody, Parenting Time, and Child Support."

The trial court denied his motion to vacate, and this appeal followed.

## ANALYSIS

### We Consider Only Those Requests for Relief Substantively Addressed by Monroe in his Appellate Briefs

According to the notice of appeal, Monroe appealed from family court orders regarding "custody, parenting time, child support, child-supported tax exemptions, the disposition of the parties' real property, contempt, and award of attorney fees[.]" And Monroe named Wright's attorney as an Appellee along with Wright. However, Monroe does not specifically challenge the attorney fee award or cite authority to support disturbing the attorney fee award in his appellate briefs. Nor does Monroe cite authority about or specifically argue error in the family court's resolution of issues other than timesharing or property disputes in his briefs. Instead, he generally asks for reversal of family court orders.[6]

---

[6] Monroe's briefs generally request reversal of the family court's orders entered in September and October 2022 – *i.e.*, the judgment setting forth its findings of fact and conclusions of law

-8-

For example, he does not clearly argue in his appellate briefs that the family court erred in finding him to be in contempt and he cites no authority regarding contempt. And though he generally seeks reversal of the family court's fall 2022 judgment, he does not explicitly argue in his appellate briefs that the family court lacked jurisdiction or otherwise erred in ordering him to vacate the home in the spring of 2021. We further note his counsel conceded the family court had jurisdiction to order him to vacate the home during the recorded hearing.

Monroe generally calls for disturbing the family court's timesharing decision in favor of equal timesharing. And though he does not explicitly argue that the child support obligation set by the family court was erroneous, he asks that the family court's child support determination be reconsidered on remand in light of a later-enacted statute and any increase in parenting time he may receive on remand. But the only specific relief he requests on appeal is that he "should receive his portion of the value of the property, and the portion of the Order requiring him to execute a Quitclaim and pay damages to Emily [Wright] should be vacated."

We decline to address whether Monroe might be entitled to any relief beyond that which he clearly requested and cited authority to support his being

---

regarding parenting time and property issues and other issues, and the order denying Monroe's motion to vacate.

entitled to that relief in his appellate briefs. "[A] terse, conclusory assertion wholly unaccompanied by meaningfully developed argument or citation to authority is insufficient to merit appellate relief." *Schell v. Young*, 640 S.W.3d 24, 32 (Ky. App. 2021).

Therefore, we consider only two issues: 1) whether the family court erred in not granting Monroe equal (or closer to equal) timesharing, and 2) whether the family court erred in requiring Monroe to execute a quitclaim deed ceding his interest in the house and in requiring him to pay Monroe over $6,500 in home-related expenses.

**No Reversible Error in Not Granting Monroe Equal Timesharing**

First, we consider Monroe's argument that the family court erred in not granting him equal timesharing and, in his view, failing to maximize the time he has with the child.

KRS[7] 403.270(2) provides in pertinent part:

Subject to KRS 403.315, there shall be a presumption, rebuttable by a preponderance of evidence, that joint custody and equally shared parenting time is in the best interest of the child. If a deviation from equal parenting time is warranted, the court shall construct a parenting time schedule which maximizes the time each parent or de facto custodian has with the child and is consistent with ensuring the child's welfare.

---

[7] Kentucky Revised Statutes.

-10-

KRS 403.270(2) also directs the court to consider several factors in determining the child's best interests – including the wishes of the parents and the child, the relationships between the parents and child, the motivation of parents, the child's adjustment and proximity to home and school, the mental and physical health of the individuals involved, and the likelihood either party would allow the other contact with the child.

The family court's interpretation of statutes such as KRS 403.270 must be reviewed *de novo*. *Layman v. Bohanon*, 599 S.W.3d 423, 429 (Ky. 2020). But its decisions about child custody, visitation, and timesharing are reviewed for abuse of discretion. *See id*. at 431; *Glodo v. Evans*, 474 S.W.3d 550, 552 (Ky. App. 2015).

As for factual findings, those are reviewed for clear error (the most deferential standard of review) – meaning they shall not be disturbed unless not supported by substantial evidence. CR 52.01; *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003); *Jones v. Jones*, 617 S.W.3d 418, 423 (Ky. App. 2021).

Having reviewed the trial videorecording and the family court's written orders, we discern no clear error in the family court's factual findings nor abuse of discretion in its decision about timesharing. Nor do we discern any error in the family court's interpretation of statutes about timesharing.

The family court determined that Wright overcame "any presumption that equal timesharing would be in [the child's] best interest" after explicitly recognizing that KRS 403.270(2) established a rebuttable presumption – subject to KRS 403.315[8] – that equal parenting time would be in a child's best interest. In short, the family court was clearly aware of KRS 403.270's rebuttable presumption of equal timesharing being in a child's best interest. But the family court found Wright had rebutted the presumption. And the family court's judgment discussed several factors leading it to find equal timesharing not in the child's best interest.

For example, the family court found Wright to be the child's primary caregiver, to be attuned to the child's developmental and emotional needs, and to have the ability to meet the child's needs with limited contributions by Monroe. The family court also found Wright had not engaged in behavior putting the child's mental or emotional health at risk.

In contrast, the family court found Monroe to have severe parenting deficits with a limited knowledge of the child's needs such as the need for an established bedtime. The family court also found Monroe did not maintain appropriate parent/child boundaries as he made profane, disparaging remarks about

---

[8] KRS 403.315 states that the rebuttable presumption in KRS 403.270 that equal timesharing would be in a child's best interest does not apply "as to the party against whom the domestic violence order is being or has been entered." In the instant case, neither party had a domestic violence order entered against them.

Wright to the child. The court also found Monroe was unconcerned about leaving the child without furniture, toys, or clothes at the home after he vacated it and that his motivation for seeking additional parenting time was to reduce his child support obligation. The court also noted Monroe repeatedly stated he was only willing to pay for the child's expenses for times the child was in his care.

The family court also noted both parties' wishes about timesharing in its findings of fact. It found the parties had a contentious relationship with allegations of domestic violence. It noted Wright acknowledged that the child was attached to Monroe and that it was important for the child and Monroe to spend time together. It also found Wright was flexible and allowed Monroe extra time with the child when Wright was not available or on holidays such as Father's Day. In contrast, it noted that Monroe had nothing positive to say about Wright and described abusive text messages he sent to her as justified in his testimony.

The family court also noted Wright's full-time employment for several years at the same job with health insurance benefits, her use of a childcare provider, and her providing an appropriate home to the child at the house she purchased. The family court found Monroe currently lived with his parents, he was also employed full time, and he expressed a desire to share time equally because he believed it would excuse him from paying child support.

The family court may not have employed the exact language used in KRS 403.270(2) in determining the child's best interest. But it substantively discussed the parents' wishes, the relationships between the parents and child, the motivation of the parents, the child's adjustment and proximity to her home and daycare, the mental and physical health of the parents and the child, and the likelihood either party would allow the other contact with the child.[9] Thus, it appropriately considered KRS 403.270(2) factors relevant to this case.

---

[9] KRS 403.270(2) calls for consideration of all relevant factors in determining what parental time sharing arrangement is in a child's best interest, including:

(a) The wishes of the child's parent or parents, and any de facto custodian, as to his or her custody;

(b) The wishes of the child as to his or her custodian, with due consideration given to the influence a parent or de facto custodian may have over the child's wishes;

(c) The interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may significantly affect the child's best interests;

(d) The motivation of the adults participating in the custody proceeding;

(e) The child's adjustment and continuing proximity to his or her home, school, and community;

(f) The mental and physical health of all individuals involved;

. . .

(k) The likelihood a party will allow the child frequent, meaningful, and continuing contact with the other parent or de facto custodian . . . .

Furthermore, though Monroe claims that the family court failed to maximize his time with the child based on the percentage of parenting time allotted to him, the family court noted its legal obligation to "construct a schedule that maximizes the time the child has with each parent and is consistent with the child's welfare."[10] Given the family court's findings about Monroe's lack of cooperation with Wright and severe parenting deficits, it effectively concluded that continuing the previous timesharing plan would both maximize the child's time with both parents and be consistent with the child's welfare. *See* KRS 403.270(2). Thus, we cannot agree with Monroe's argument that the family court failed to identify its reasons for concluding equal timesharing was not in the child's best interests and for not awarding more parenting time to Monroe.

---

[10] Monroe argues in his appellant brief that the family court erred in quoting the following portion of *Barnett v. White*, 584 S.W.3d 755 (Ky. App. 2019), *discretionary review denied* (Oct. 24, 2019): "While the new version of KRS 403.270(2) puts a finger on the scale in favor of joint custody and equal timesharing . . . such a preference is a slight burden and the trial court continues to possess broad discretion in determining the best interest of the child as to who should have custody and where the child shall live." *Id.* at 761. Monroe contends this quote from *Barnett* misinterprets legislative intent and is inconsistent with later case law construing KRS 403.270(2) such as *Layman*, 599 S.W.3d at 423. But given the family court's explicit recognition of the rebuttable presumption that equal timesharing is in a child's best interest and of its obligation to devise a timesharing plan maximizing the time spent with both parents consistent with the child's welfare if the presumption for equal timesharing is rebutted, we discern no reversible error in the family court's quoting *Barnett*.

Furthermore, we decline to address an opinion cited in Monroe's brief which our Supreme Court ordered to be de-published since unpublished cases are not binding authority. *See* Kentucky Rules of Appellate Procedure (RAP) 41(A). We also note that Monroe's brief fails to comply with the requirement that one clearly state that unpublished opinions are not binding authority when asking the Court to consider an unpublished opinion. *See* RAP 41(A)(4).

Regardless of whether we or a different court would resolve the timesharing issues in the same manner, the family court did not overlook or misconstrue controlling law and its factual findings are supported by substantial evidence. Nor do we discern any abuse of discretion in its determining that continuing the prior timesharing plan was in the child's best interest and would maximize the time spent with both parents in a manner consistent with the child's welfare. In short, Monroe has presented no adequate reason for us to reverse the family court's decision regarding timesharing. *See generally Layman*, 599 S.W.3d at 429-31.

Furthermore, as we affirm the family court's timesharing decision, there is no need to address Monroe's argument that his child support obligation must be reconsidered on remand and adjusted to reflect increased parenting time pursuant to the current version of KRS 403.2121 (effective March 31, 2023) – which was not in effect at the time of the family court's judgment.

Next, we address Monroe's contention that the family court erred in resolving property disputes between the parties.

**We Reverse Judgment Provisions Requiring Monroe to Execute Quitclaim Deed and to Pay $4,500 for Furniture Replacement as Monroe Did Not Receive Proper Notice of Claims or Requests for Relief in these Regards**

Monroe argues on appeal that the family court erred in concluding it had subject-matter jurisdiction to resolve property disputes between former

-16-

unmarried partners. But we decline to reach the interesting issue of whether the family court did, in fact, have subject-matter jurisdiction over any property disputes between these unmarried ex-partners.[11]

Instead, even assuming *arguendo* that the family court had subject-matter jurisdiction over such property disputes between parties never married to each other, the family court should have declined to address the parties' property issues because there was no proper pretrial notice of any property issue claims.

---

[11] As noted by the family court judgment, some Kentucky constitutional language appears to broadly accord to family courts the same general jurisdiction as any Circuit Court. *See* Constitution of Kentucky (Ky. Const.) §112(6). And constitutional provisions prevail over any conflicts in statutes. *Cavanaugh v. Commonwealth*, 671 S.W.3d 17, 21 (Ky. 2022).

Furthermore, our precedent indicates family courts have broad jurisdiction under Ky. Const. §112(6) – beyond the specific areas of family court jurisdiction identified in KRS 23A.100. *See Uninsured Employers' Fund v. Bradley*, 244 S.W.3d 741, 745 (Ky. App. 2007). *See also Wallace v. Wallace*, 224 S.W.3d 587, 591 (Ky. App. 2007) ("The very purpose for the creation of the family courts is to consolidate litigation and controversies related to a family into one court."). However, neither *Bradley* nor *Wallace* addressed whether a family court had subject-matter jurisdiction to divide property or otherwise resolve property disputes between partners who were never married to one another.

Also, Kentucky precedent makes clear that Kentucky does not recognize common law marriage and does not afford to former members of an unmarried couple the same types of property rights as formerly married couples. *See Murphy v. Bowen*, 756 S.W.2d 149, 150 (Ky. App. 1988); *Nelson v. Mahurin*, 994 S.W.2d 10, 16 (Ky. App. 1998). *See also* KRS 403.190(1) (providing that a court shall assign each former spouse's property to him/her and shall divide the marital property in dissolution of marriage proceedings). There is no equivalent Kentucky statute about a court's authority to divide any jointly held property of former unmarried partners upon their breakup.

Nonetheless, we need not resolve whether the family court had subject-matter jurisdiction to resolve the parties' property disputes. Even if we presume solely for the sake of argument that subject-matter jurisdiction existed (meaning the family court had the authority to decide that type of claim), we conclude that the family court erred in resolving property issues by requiring Monroe to quitclaim his interest in the house and to pay $4,500 in furniture replacement costs due to lack of notice.

-17-

Though Monroe did not explicitly argue lack of notice in his appellate briefs, appellate courts have discretion to address facts in the record as necessary to avoid a misleading application of the law. *See Slone v. Calhoun*, 386 S.W.3d 745, 748 (Ky. App. 2012); *Mitchell v. Hadl*, 816 S.W.2d 183, 185 (Ky. 1991); *Priestley v. Priestley*, 949 S.W.2d 594, 596 (Ky. 1997). *See also* CR 61.02 ("A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial **or by an appellate court on appeal, even though insufficiently raised or preserved for review**, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.") (emphasis added). But we also recognize that binding precedent from our Supreme Court indicates that we should decline to find palpable error *sua sponte* when the error was not raised to the trial court. *See Norton Healthcare, Inc. v. Deng*, 487 S.W.3d 846, 852 (Ky. 2016).

However, Monroe effectively argued lack of notice to the family court despite his failure to make this argument in his appellate briefs. Monroe argued to the family court that property issues were not properly before the family court in the hearing scheduled on child custody and support and contempt. He also argued that it was not proper to resolve property issues in a proceeding filed solely for purposes of determining child custody and support and not for the purpose of

-18-

marital dissolution. We construe these arguments as encompassing assertions of lack of notice of property issue claims.

Based on the record before us, we cannot ignore the lack of notice of property issue claims or requests for relief in the form of quitclaim deeds or furniture replacement reimbursement. Clearly Wright had the burden to plead her claims and to identify the type of relief sought in her pleadings as well as the burden of proving her claims:

> In presenting the claim for damages, the burden of pleading and proving the damages is on the plaintiff. The pleadings are expected to raise the issue of damages while the evidence presented in the case will furnish the basis for recovery. The pleadings must first give fair notice of the type of relief that is being sought. Then the evidence in the case must prove the damages to a reasonable certainty.

RONALD W. EADES, *General principles of recovery*, KY. L. OF DAMAGES § 1:4 (Feb. 2023 update) (footnotes omitted). This quoted principle follows our civil rules about pleadings.

"A pleading which sets forth a claim for relief . . . shall contain (a) a short and plain statement of the claim showing that the pleader is entitled to relief and (b) a demand for judgment for the relief to which he deems himself entitled." CR 8.01(1).[12] "The principal objective of a pleading is to give the opposing party

---

[12] CR 7.01 states the only pleadings to be allowed include complaints, answers, and replies to counterclaims, and replies to answers if such replies to answers are ordered by the court.

-19-

fair notice of the . . . nature of the claim presented and the type of relief to which the claimant deems himself entitled." *Lee v. Stamper*, 300 S.W.2d 251, 253 (Ky. 1957) (citing CR 8.01 and CR 9.06).

Although some originally un-pleaded claims may be tried by consent, particularly if pleadings are amended to conform to the evidence, *see* CR 15.02, Monroe clearly objected to the family court's trying any property issues. Wright's petition asked the family court to resolve issues of child custody, support, and timesharing. But she did not plead a claim to set aside a deed based on duress nor did she plead any claim alleging any property disputes between the parties or asking the court to divide property. And she never amended or requested to amend her pleadings based on our review of the record.

Though pleadings are construed somewhat liberally under Kentucky's "notice pleading" standard and technical precision is not required, a plaintiff must still provide fair notice and identify the claim(s) in his/her pleadings to provide the defendant a fair opportunity to defend against the claim(s). *See Watson v. Landmark Urology, P.S.C.*, 642 S.W.3d 660, 671-72 (Ky. 2022); *Russell v. Johnson & Johnson, Inc.*, 610 S.W.3d 233, 240-41 (Ky. 2020).

Monroe was not provided fair notice of property issue claim based on our review of the record. Nor was Monroe provided fair notice of Wright's requests for a quitclaim deed and furniture replacement reimbursement. Wright

requested reimbursement of specific costs such as the sheriff's eviction fee and the cost of cleaning and repairs and restoring electric service to the house in her contempt motion. But she did not specifically request that the trial court order Monroe to reimburse her for missing or damaged furniture or to quitclaim his interest in the house in her contempt motion or in her custody and support petition.

Wright requested that Monroe be required to execute a quitclaim deed ceding his interest in the home in her trial memorandum. She also mentioned in her trial memorandum that she paid the mortgage to avoid foreclosure even after Monroe refused to vacate. But she did not cite any supporting authority for requiring Monroe to quitclaim his interest in the house and she did not allege duress or any other basis for doing so. Instead, she simply stated he had been placed on the deed before requesting the family court to order him to quitclaim his interest in the house to her. Moreover, a trial memorandum is not a pleading. CR 7.01.

In short, Monroe was not provided notice that he should be prepared to defend himself against allegations of duress at the hearing. Nor was he provided notice of property issue claims in the pleadings.

As the record shows a lack of such proper notice of property issue claims before the hearing, palpable error occurred. So, we reverse the family court's requiring Monroe to execute a quitclaim deed ceding his interest in the

house and its requiring Monroe to pay Wright $4,500 for furniture replacement. We reverse the furniture replacement reimbursement provision because of lack of notice of a request for furniture replacement reimbursement and because this provision – unlike other contempt provisions requiring payment of other costs – depends on a resolution of disputes about ownership about property.

Again, Wright did not assert any claims regarding resolving ownership of or dividing property in her petition. She asserted that Monroe had violated court orders by taking personal property he had not bought himself with him when he vacated the house in her contempt motion. And she stated an intention to offer evidence of the value of wrongfully removed items of personal property in her contempt motion. But she specifically requested only reimbursement of other costs, which did not include the value of any personal property taken in her contempt motion.

The family court had ordered Monroe to take only his personal property which he had purchased solely by himself upon vacating the house. Monroe insisted in his testimony that he took only personal property purchased by him or given to him by his parents.

Wright testified that she had been given two sofas which she found damaged after returning to the home. And she testified that some personal property items had been purchased by her, other such items had been purchased by

Monroe, and that other items had been given to the couple by family or friends. Wright admitted she did not have receipts, but she estimated she had spent $1,000 to $2,000 per room to replace furnishings or appliances. But she never specifically testified to having bought or been given all personal property items (including furniture) which had been removed or damaged.

In short, the testimony does not show that the parties agreed as to the ownership of all furniture or other personal property items. Yet Monroe was not notified of any claims asserted to resolve the ownership of personal property or to divide such personal property in the petition. Nor was he notified of Wright's request to be reimbursed for furniture replacement costs in pleadings or in the contempt motion. So, he did not have a fair opportunity to prepare to defend against property issue claims or to present evidence about his ownership of furniture or the reasonable costs of replacing it – just as he did not receive notice that he would need to defend against allegations that the deed to the house was procured by duress.

The judgment provision requiring Monroe to quitclaim his interest in the house appeared in the section of the judgment labeled "property issues" – although no property issue claims were pleaded in the petition. Unlike the quitclaim provision, the furniture replacement reimbursement provision was issued in the section of the judgment about contempt. Despite our recognition of the

family court's broad authority to exercise contempt powers, we conclude the family court abused its discretion in exercising its contempt power to require Wright to pay $4,500 for furniture replacement. *See Nienaber v. Commonwealth ex rel. Mercer*, 594 S.W.3d 232, 235 (Ky. App. 2020) (recognizing abuse of discretion standard for reviewing a court's exercise of its contempt powers, though underlying factual findings are reviewed for clear error). Given the lack of notice of a request for furniture replacement reimbursement and the resolution of personal property ownership issues which this entailed despite lack of notice of any property claims, the furniture reimbursement replacement provision was unfair and "unsupported by sound legal principles" and thus an abuse of discretion. *See id*.

We reverse the family court's requiring Monroe to pay $4,500 to replace missing or damaged furniture along with its requiring him to sign the quitclaim ceding his interest to the house. However, we affirm the family court's ordering him to pay about $2,000 for other costs.

**We Affirm the Family Court's Awarding Wright About $2,000 in Costs Directly Related to Violation of Court Orders and Not Requiring Resolution of Any Property Disputes as Valid Exercise of Contempt Power**

Though we reverse the family court's judgment provision requiring Monroe to pay $4,500 in furniture replacement costs, we affirm the family court's requiring Monroe to pay about $2,000 in other costs directly related to his violation of orders to vacate and to leave the real property clean and damage-free as a proper

-24-

exercise of its contempt power. We discern no abuse of discretion in requiring Monroe to pay these other, non-furniture-related costs especially since Monroe received notice of Wright's request to be reimbursed for these costs.

Wright explicitly requested reimbursement for these other costs (not relating to replacement of the furniture which was personal property of disputed ownership) in her contempt motion. Namely, she requested, *inter alia*, reimbursement of over $1,300 in costs to repair and clean the house, $60 for a sheriff's bill to remove Monroe from the house, and a bill for over $600 to restore electric power to the house. And there was substantial evidence presented at trial to support the court ordering Monroe to pay those costs.

Monroe conceded that the family court had authority to order him to vacate the house despite his ownership interest in the house, despite challenging its authority to order him to pay restitution for property damage. Furthermore, we discern no abuse of discretion in the family court's requiring Monroe to pay about $2,000 in costs directly related to his violating its orders to vacate and to leave the real property clean and damage-free, nor do we discern any clear error in its factual findings in this regard. *See Nienaber*, 594 S.W.3d at 235. Ordering Monroe to pay these other, non-furniture replacement costs was a valid exercise of the family

court's contempt power despite Monroe having an ownership interest in the house under the facts and circumstances here.[13]

We decline to discuss other arguments in the parties' briefs as we deem them to lack merit or relevancy to our resolving this appeal.

**CONCLUSION**

For the foregoing reasons, we affirm the family court's parenting time decision. We also affirm its requiring Monroe to pay approximately $2,000 to reimburse Wright for costs incurred due to Monroe violating court orders requiring him to vacate the house and to leave the real property clean and damage free. But we reverse those judgment provisions requiring that Monroe sign a quitclaim deed ceding his interest in the house and requiring that Monroe pay $4,500 for furniture replacement. Upon remand, the family court shall enter an amended judgment removing the provisions requiring Monroe to issue the quitclaim and to pay $4,500 for furniture replacement.

JONES, JUDGE, CONCURS.

TAYLOR, JUDGE, CONCURS IN RESULT ONLY.

---

[13] Though the parties did not clearly argue whether the family court abused its discretion in exercising its contempt powers in their appellate briefs, we have the authority to affirm for any reason supported by the record. *See Mark D. Dean, P.S.C. v. Commonwealth Bank & Tr. Co.*, 434 S.W.3d 489, 496 (Ky. 2014) ("If an appellate court is aware of a reason to affirm the lower court's decision, it must do so, even if on different grounds.").

-26-

BRIEFS FOR APPELLANT:

Allison S. Russell
Shanna R. Bollinger
Louisville, Kentucky

BRIEF FOR APPELLEE EMILY WRIGHT:

Robert Louis Fleck
Louisville, Kentucky